FILED
IN THE UNITED STATES DISTRICT COURT U.S. DISTRICT COURT

DISTRICT OF UTAH – CENTRAL DIVISION 2006 MAY - I A 10: 0:1

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

| | |
|---|---|
| INTERNATIONAL ASSOCIATION OF UNITED MINE WORKERS UNION, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED MINE WORKERS OF AMERICA, *et al.*,<br><br>Defendants. | **OPINION AND ORDER**<br><br>Case No. 2:04cv00901<br><br>Judge Dee Benson |

Various defendants have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the claims asserted against them in the Second Amended Complaint.

## BACKGROUND

C. W. Mining Company ("CWM") owns and operates a coal mine in the Bear Canyon region of Emery County, Utah. In September 2003, a labor dispute broke out between CWM and some of its miners following the dismissal of miner Bill Estrada. CWM claimed that Mr. Estrada was fired for insubordination after he had been caught falsifying a safety inspection record. Mr. Estrada maintained he was dismissed for confronting CWM supervisors when they threatened disciplinary action against two of his colleagues, Oscar Sosa and Juan Salazar, for alleged infractions of work rules. Following Mr. Estrada's dismissal, CWM claimed that approximately 75 fellow miners joined Mr. Estrada and walked away from their jobs to stage an illegal wildcat strike. The miners, however, maintained that after they came to Mr. Estrada's defense, they were then told by a CWM foreman that they had all been fired.

A labor standoff ensued. The miners claimed they were underpaid, exploited and abused. They also claimed that their internal union, the International Association of United Mine

Workers Union ("IAUWU"), was merely an appendage of management and that they had been fired when they attempted to form an independent labor union. CWM maintained that all of its labor practices were fair and that the IAUWU was a legitimate labor union that fully represented the interests of the miners. CWM claimed to have fired several miners because they were illegal immigrants who had falsified documents in order to obtain employment.

The United Mine Workers Association ("UMWA"), a labor union affiliated with the AFL-CIO, quickly intervened on behalf of the striking miners. On September 23, 2003, the UMWA filed a complaint with the National Labor Relations Board ("NLRB") alleging that approximately 80 miners were discharged improperly. On October 22, 2003, the IAUWU filed a complaint with the NLRB against the UMWA alleging unfair labor practices by a labor organization under 29 U.S.C. § 158. The labor standoff continued for approximately eight months until CWM and UMWA settled their claims with the NLRB on July 1, 2004. The settlement provided that the miners be reinstated to their jobs and receive back pay as determined by the NLRB Regional Director.

The labor dispute was highly publicized locally and also received considerable national attention. Both CWM and the miners were interviewed by a variety of media outlets to articulate their respective positions. The Salt Lake Tribune and the Deseret Morning News, Utah's two major daily newspapers, published many articles throughout the course of the dispute. The Salt Lake Tribune published at least nine articles concerning the dispute beginning on September 26, 2003 and ending on July 14, 2004. *See* Complaint. Similarly, the Deseret Morning News published as least nine articles concerning the dispute beginning on October 30, 2003 and ending on July 8, 2004. *See* Complaint. The Militant, a socialist newspaper with limited circulation headquartered in New York City, published at least 55 articles describing the dispute. *See*

2

Complaint. The Intermountain Catholic newspaper, the Emery County Progress, the Provo Daily Herald, the Price Sun Advocate, and the Salt Lake City Weekly also published numerous articles about the labor dispute.

Following settlement of the NLRB claims, CWM, the IAUWU, and other plaintiffs (collectively "plaintiffs") filed an 80-page complaint in the United States District Court for the District of Utah alleging defamation and other claims against nearly one hundred defendants, including the UMWA, the AFL-CIO, the Socialist Workers Party, The Militant, the Salt Lake Tribune, the Deseret Morning News, the Price Sun-Advocate, Jobs with Justice, the Tapestry Against Polygamy, the Roman Catholic Church, and many of the striking miners. *See* Complaint. Three months later, the plaintiffs filed an amended complaint. *See* Amended Complaint. Several of the defendants, including the Salt Lake Tribune, the Deseret Morning News, and the Militant moved to dismiss the amended complaint pursuant to Rule 12(b)(6) and the Court heard oral argument on these motions on June 14, 2005. The Court found the pleading was insufficiently precise to allow the defendants to respond, but rather than dismiss the case allowed the plaintiffs to file a second amended complaint. The Court stated:

> The plaintiffs are to file a second amended complaint. I'll grant leave for that filing, which needs to clearly allege who is being sued for what and by whom.... In its present form the amended complaint is sufficiently vague and insufficiently precise to stand as a complaint upon which relief may be granted and from which this litigation may proceed.

*See* Transcript of June 14, 2005 Hearing, at 69 and 74. Pursuant to the Court's Order, the plaintiffs filed a second amended complaint on July 13, 2005. In their Second Amended Complaint, the plaintiffs reduced the number of defamatory statements alleged against the Salt Lake Tribune from 38 to 10 and against the Deseret Morning News from 30 to 5. Following the plaintiffs' submission of the Second Amended Complaint, the Salt Lake Tribune, the Deseret

3

Morning News, the Militant, the UMWA, Jobs with Justice, and other individual defendants again moved to dismiss the claims pursuant to Rule 12(b)(6). The Court heard oral argument on these motions on February 17, 2006, and at the conclusion of the hearing announced from the bench its intention to dismiss the claims against the Salt Lake Tribune and the Deseret Morning News. The Court also announced that reasonable attorneys' fees would be awarded to both the Salt Lake Tribune and the Deseret Morning News. The Court now issues the following Opinion and Order articulating its reasons for dismissing the claims against the Salt Lake Tribune and the Deseret Morning News and GRANTING dismissal in part and DENYING dismissal in part with respect to the other defendants.

**ANALYSIS**

## I.      Motions to Dismiss

Dismissal under Rule 12(b)(6) is proper "only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief." *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000) (citations omitted). Well-pleaded allegations in the complaint are accepted as true and construed in the light most favorable to the non-moving party. *See Id.* (citations omitted). Dismissal for failure to state a claim "[s]hould not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Sutton v. Utah State School for the Deaf and Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (citations omitted). The Court will now discuss each claim in turn.

### A.      Defamation

The plaintiffs have brought state law claims for defamation against the Salt Lake Tribune, the Deseret Morning News, The Militant, the individual miners, the UMWA and Jobs With

4

Justice.  To state a claim for defamation under Utah law, a plaintiff must show "that defendants published the statements concerning him, that the statements were false, defamatory, and not subject to any privilege, that the statements were published with the requisite degree of fault, and that their publication resulted in damage." *West v. Thomson Newspapers*, 872 P.2d 999, 1007-8 (Utah 1994) (Citations omitted).

The Utah Supreme Court provided a careful analysis of defamatory meaning in *Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1988), stating: "The tort of defamation protects only reputation. A publication is not defamatory simply because it is nettlesome or embarrassing to a plaintiff, or even because it makes a false statement about the plaintiff.  Thus, an embarrassing, even though false, statement that does not damage one's reputation is not actionable as libel or slander." *Id.* To determine whether defamatory meaning exists, the court must consider whether a reasonable reader could reasonably infer defamation.  "If no defamatory meaning can reasonably be inferred by reasonable persons from the communication, the action must be dismissed for failure to state a claim.  Only if a court first determines that a publication might be considered defamatory by a reasonable person is there a fact issue for the trier of fact." *Id.*

Context is key in determining defamatory meaning.  The Utah Supreme Court has stated, "[I]n determining whether a particular statement fits within the rather broad definition of what may be considered defamatory, the guiding principle is the statement's tendency to injure a reputation in the eyes of its audience." *West v. Thomson Newspapers*, 872 P.2d 999, 1008 (Utah 1994).  "A court simply cannot determine whether a statement is capable of sustaining a defamatory meaning by viewing individual words in isolation; rather, it must carefully examine the context in which the statement was made, giving the words their most common and accepted

meaning." *See Id.*, at 1009. Thus a court must consider an entire article to determine whether a reasonable reader could infer defamation.

Editorials are given more latitude than other articles with respect to defamation. An editorial, by definition, contains the opinions of its author. Statements of opinion can only be defamatory if they imply facts that are false and defamatory. The Utah Supreme Court has ruled:

> [A]rticle I, sections 1 and 15 [of the Utah Constitution] protect expressions of opinion, and this protection is "abused" when the opinion states or implies facts that are false and defamatory. If the opinion does not state or imply such facts or if the underlying facts are not defamatory, an action for defamation is improper.

*West v. Thomson Newspapers*, 872 P.2d at 1015. In *West*, the Court noted that newspaper editorials are "a traditional source of harsh political invective." *Id.*, at 1009. "Newspaper readers expect that statements in editorials will be more exaggerated and polemicized than "hard news." Readers are therefore less likely to form personal animus toward an individual based on statements made in an editorial." *Id.* The United States Supreme Court has stated, "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974).

Even though defamation is a state law claim, the United States Supreme Court has recognized constitutional boundaries on defamation claims arising from labor disputes. The United States Supreme Court requires plaintiffs to prove malice and actual harm in defamation claims arising from labor disputes. *See Linn v. United Plant Guard Workers of America, Local . 114*, 383 U.S. 53 (1966). In *Linn,* an assistant general manager of Pinkerton's National Detective Agency sued the United Plant Guard Workers of America labor union and a Pinkerton employee for circulating leaflets that stated, in part, "These Pinkerton guards were robbed of pay increases. The Pinkerton manegers (sic) were lying to us-all the time the contract was in effect. No doubt

6

the Saginaw men will file criminal charges. Somebody may go to jail!" *Id.*, at 56. The

petitioner complained the statements were defamatory and that a reader could infer his identity

from the reference to a Pinkerton manager in Saginaw, which he was. The Court noted that labor

disputes "[a]re frequently characterized by bitter and extreme charges, countercharges,

unfounded rumors, vituperations, personal accusations, misrepresentations and distortions. Both

labor and management often speak bluntly and recklessly, embellishing their respective positions

with imprecatory language." *Id.*, at 58 (citations omitted). It then ruled, "We therefore limit the

availability of state remedies for libel to those instances in which the complainant can show that

the defamatory statements were circulated with malice and caused him damage." *Id.*, at 64-65.

The Court will now consider the defamation claims against each defendant to determine

whether a claim has been stated upon which relief may be granted pursuant to Rule 12(b)(6).

## I.      The Salt Lake Tribune and the Deseret Morning News

Plaintiffs' defamation claims against the Salt Lake Tribune and the Deseret Morning

News fail because the allegedly defamatory statements cannot convey the defamatory meaning

required by Utah law or the malice required under *Linn*.

### A.      The Salt Lake Tribune

#### *1. A Show of Support*

Plaintiffs first claim as set forth in the Second Amended Complaint, paragraph 162, reads

as follows:

The Salt Lake Tribune reporter Rhina Guidos said:
a.       For more than seven months, the workers have been locked out of their
         mining jobs at CW Mining Co., and the workers have been asking for their
         jobs back "with the right to organize a union," which was a false assertion
         that CWM's workers not only had not exercised their right to form a
         union, the IAUWU, but that CWM had tried to prevent its workers from
         organizing a union.

7

The full article to which this claim refers reads:

**A Show of Support: Utah's Catholic leader speaks out, offers prayers for striking miners; Bishop shows support for miners**
**Rhina Guidos, The Salt Lake Tribune**

HUNTINGTON - Bishop George Niederauer stepped out of his sedan and into the warm spring afternoon along state Road 31 on Tuesday, arriving to show his support for miners who have been on strike here for months. Across the street, a crowd of about 25 of the miners and their families - most of them Mexican immigrants, most of the Catholics - were happy to see that the head of the Salt Lake Catholic Diocese was joining their struggle.

*For more than seven months, the workers have been locked out of their mining jobs at CW Mining Co., also known here as the Co-op mine, and there is no resolution in sight. In the sun and snow of those months, they have been at the entrance of the mine asking for their jobs back, but with better wages, with health insurance for themselves and their families, and with the right to organize a union.*

"I drove two hours to come here and two hours back" to Salt Lake City, Niederauer told them. "But you sacrifice day after day. You are in my prayers, and you are in the prayers of the people."

It is the first time the bishop has made such a visit in Utah. But by joining the strikers on Tuesday, Niederauer said, he is following in the footsteps of other Christians and his predecessors in the church. "I'm not striking out in any radical new way," he said.

He said a prayer for the strikers alongside an image of the Virgin of Guadalupe, housed inside a trailer that the Utah Department of Transportation tried to have removed in April.

As Co-op workers and the owners of the mine - members of the polygamous Kingston clan - left for the day, Niederauer listened to stories from the striking workers, about how little they made, about how their families are suffering.

At San Rafael Mission outside of Huntington, he celebrated a Mass for the workers, their families and the communities that have supported them. Later he shared a meal with them.

"This has been hard," said Jesus Salazar, one of the strikers. "But we have to keep going."

The visit from Niederauer was a boost to the dwindling picket line, as some strikers have left for better paying jobs at other mines.

Valente Leon, a former Co-op worker, said he's making more money at a new job. But just because his life is better, the struggle isn't over, he said. He stopped to shake Niederauer's hand and to ask him to help the strikers. "I will sill come by after work to lend them support," Leon said.

Though the Kingstons may not listen to the Catholic bishop of Salt Lake, Niederauer said the purpose of his visit was to speak out for fair wages, for safe working conditions, for the right to associate as workers. "They are all being denied to the workers" at the Co-op mine, he said.

8

Seminarian Oscar Martinez has been helping with efforts to get the Kingstons and workers talking. So far, he said, it has yielded a letter offering the workers their jobs back, but at the same wages and conditions as before. But striker Alyson Kennedy said they won't go back to the mine until they are treated with dignity and respect. "We will go back, but with our heads held high," she said.

And that's what the church leaders want, too, Martinez said. He hopes that the bishop's visit will facilitate that. "Our role is to accompany them spiritually and to accompany them on this strike," he said. "It is not a battle against this [the Kingston] family."

Rhina Guidos, *A Show of Support*, S.L. Tribune, May 5, 2004, at A1. (emphasis on alleged defamatory statements).

The allegedly defamatory statement within the article cannot convey defamatory meaning. While the plaintiffs have alleged that it was a false assertion that the CWM employees had not exercised their right to organize a union, such an assertion if it exists at all, was implicit, and in any event the article attributes any such assertion to the miners. CWM makes no allegation that the Salt Lake Tribune falsely attributed those claims to the miners. The fact of the matter is the workers actually were asking for their jobs back "with the right to organize a union."

Even if the statements were false, they could not convey defamatory meaning. The article was entitled *"A Show of Support: Utah's Catholic Leader Speaks Out, Offers Prayers for Striking Miners."* This title declares that Bishop George Niederauer, not the Salt Lake Tribune, had taken a position on the labor dispute. The sentences immediately following the alleged defamation read, "'I drove two hours to come here and two hours back' to Salt Lake City, [Bishop] Niederauer told them. 'But you sacrifice day after day. You are in my prayers, and you are in the prayers of the people." *Id.* No reasonable reader could conclude that the Salt Lake Tribune intentionally attacked the reputation of CWM or its owners by publishing Bishop Niederauer's perspective on the labor dispute.

9

CWM has not alleged that the Salt Lake Tribune published this article with the requisite

malice under *Linn* nor does the content of the article indicate malice.  That the Salt Lake Tribune

sought out the employees and described their position suggests that the author and publisher

were concerned about the veracity of what they printed.  Even if a sentence or paragraph contains

false statements, no reasonable reader could conclude that they were published with the requisite

intent to injure the plaintiffs.

### 2. *Miners Win Back their Jobs*

Plaintiffs next claim defamation in the statement: "CWM workers 'were fired and locked

out' of their jobs at CWM, and Estrada was fired for union-organizing activity."  *See* Second

Amended Complaint, ¶ 162.

The full article reads:

**Miners Win Back their Jobs: Huntington workers aren't celebrating, say
safety, wages remain an issue; Miners vow to fight for better conditions
Glen Warchol and Rhina Guidros, The Salt Lake Tribune**
    A group of mostly Latino coal miners who became labor movement
celebrities after they *were fired and locked out* of a polygamous clan-owned mine
10 months ago have won reinstatement to their jobs.  However, the 75 workers at
C.W. Mining's Co-op Mine near Huntington in Emery County say their hard-
fought settlement with the owners - members of the Kingston clan - is only the
first step toward getting the right to work safely for decent wages.
    "It's an important step, but we haven't won," said *Bill Estrada, the miner
who rallied the others last year after he was fired for union-organizing activity.*
He said the settlement reached Thursday through the National Labor Relations
Board (NLRB) validated what the miners have been saying all along: The
Kingstons fired them illegally.  It also entitles the miners to back pay for the time
of the lockout in an amount that has yet to be determined.
    Workers, however, will return to the same wages, poor benefits and the
unsafe working conditions, Estrada said, so a final victory eludes them.
    The United Mine Workers of America (UMWA) already has petitioned the
NLRB to represent the miners in contract negotiations.  An election is expected
next month in which the miners will choose between the UMWA, the mine's
existing union, the International Association of United Workers, or no union,
NRLB Assistant Regional Director Wayne Benson said.

Miners say the International Association of United Workers is a "yellow-dog" or company-run union, but Benson said the NLRB did not gather sufficient evidence to support that allegation.

Telephone calls to C.W. Mining on Friday were not immediately returned. The company has maintained Estrada was fired for insubordination after having been caught falsifying a safety-inspection record. Estrada said the miners' attention now turns to next months' union vote. "It will be between the UMWA or the false union of the Kingstons," he said. "But how can [we] have a union that is owned by the company?"

The UMWA helped the miners rally support around the country and the world. In the months that followed the Sept. 22 lockout, they became labor movement celebrities, speaking at conferences and union functions from Boston to Seattle. The Utah miners received donations and moral support from labor groups in Sweden, Great Britain and New Zealand.

"Wehn we were fired from our jobs, they [the UMWA] said they'd be with us every day until it was over, and they have been," miner Alyson Kennedy said. "We're going back stronger, with a lot of support, with a lot of friends and allies," she said. "We're going back in a good position for the next stage."

On Tuesday, the miners and supporters will trek from a park in Huntington to the entrance of the mine. They will decide which workers will return to work in the mine, since many of them have taken jobs elsewhere.

Utah's Roman Catholic Bishop George Niederauer, who visited the striking miners in May, said they will continue to need public support. Like the union, the diocese has been instrumental in sending monetary and other types of donations for the miners, as well as rallying support around the state. "One of the most important things we in the public should realize is that this is no time to divert our attention away from the situation," Niederauer said. "We need to keep alert and watching ... It's important not be lulled into thinking the whole thing has been resolved."

Glen Warchol and Rhina Guidos, *Miners Win Back Their Jobs*, S.L. Tribune, July 3, 2004, at A1.

(emphasis on alleged defamatory statements).

The plaintiffs have taken pieces of sentences in order to form this puzzling allegation.

The full sentence regarding union-organizing activity reads:

"It's an important step, but we haven't won," said Bill Estrada, the miner who rallied the others last year after he *was fired for union-organizing activity*. He said the settlement reached Thursday through the National Labor Relations Board (NLRB) validated what the miners have been saying all along: The Kingstons fired them illegally.

11

*Id.* (emphasis added to show alleged defamation). Read in context, it is clear that the Salt Lake Tribune is reporting Mr. Estrada's position in the labor dispute. No reasonable reader could conclude from these sentences that the Salt Lake Tribune intentionally attacked CWM's reputation. Moreover, the Salt Lake Tribune laid out CWM's position within the same article and telephoned CWM to see if it had anything to add. The article states, "Telephone calls to C.W. Mining on Friday were not immediately returned. The company has maintained Estrada was fired for insubordination after having been caught falsifying a safety-inspection record." *Id.* Given the full context of the article, no reasonable reader could infer defamation, much less malice as required by *Linn.*

### 3. *Workers Return to Jobs at Huntington Mine*

Plaintiffs next claim the statement "The workers were allowed to return to work after being fired" defamed them. *See* Second Amended Complaint, ¶ 162. The full article reads:

> **Workers Return to Jobs at Huntington Mine**
> **Rhina Guidos**
> After being out of work for nine months over a labor dispute, more than 40 miners quietly returned Tuesday to their jobs in the caverns of a Huntington mine. The issues leading to the dispute remain unresolved. "It was uneventful," said Bill Estrada of his first day back at the Co-op mine.
> He said that miners who were locked out last September by their employer C.W. Mining entered their old workplace with stickers on their hard hats bearing the name of the United Mine Workers of America (UMWA), the union they wanted to join.
> The dispute over the workers' allegations of low wages, lack of health insurance, and unsafe or unacceptable working conditions ended earlier this month, when the National Labor Relations Board brokered a deal between the laborers and the polygamous Kingston family that owns the Co-op Mine. The company admitted no wrongdoing and *the workers were allowed to return to work after being fired.*
> Representatives of the mine did not return phone calls seeking comment.
> Next month, the workers could choose to be represented by the UMWA, the International Association of United Workers Union (IAUWU), or no union at all. The workers who picketed the company say the IAUWU - which says it has represented the mine's workers for more than 20 years - is a "yellow-dog" union

12

run by members of the Kingston family.  But the NLRB recognizes that union as a valid organization.

It wasn't easy to return to work making $6.50 an hour and still without health insurance for himself or his family, said miner Juan Salazar, 28, after a 13-hour workday.  Many of the workers have been given 48-hour work schedules this week.

Salazar, a machine operator, said he spent the first day "cleaning" the coal with a shovel.  "We went in and we didn't have problems, no one intimidated us," he said.  "But we want to attain a real union, one that will change the conditions of the mine."

Miner Alyson Kennedy also went back to work on Tuesday.  She spent Saturday watching a refresher course on mining.  "It's not clear what's going to happen," she said.

The miners will still be negotiating for back pay, she said.  And the conditions are still the same.  The women still don't have a separate place to shower or change.  She said the company offered her $1.50 a day if she signed a document accepting the lack of a separate space for female miners.  "They said they don't have money [to build separate facilities]," she said.

Like most of the workers, Estrada said he wasn't thrilled about returning to the same conditions that led the miners to strike in the first place.  "[W]e have taken a step toward an election," he said.  "That's why we're back, because we have the opportunity to change something and we think it will be possible to do it."

Rhina Guidos, *Workers Return to Jobs at Huntington Mine*, S.L. Tribune, July 14, 2004, at B2.

(emphasis on alleged defamatory statements).

Plaintiffs have again selected only a portion of a sentence in their attempt to claim defamation.  The whole sentence reads, "The company admitted no wrongdoing and *the workers were allowed to return to work after being fired*." *Id.* (emphasis on alleged defamatory statement).  The article's next sentence reads, "Representative of the mine did not return phone calls seeking comment." *Id.*  No reasonable reader could interpret these statements as an intentional attack on the plaintiffs' reputation.  CWM had the opportunity to state its position that the miners were not fired.  The Salt Lake Tribune states that it inquired as to CWM's position.  Not only does the statement fail to cast CWM in a bad light, it is devoid of malice.

### 4. *Immigrant Miners Take On Kingstons*

13

Plaintiffs next claim "The Salt Lake Tribune reporter Corey Hilton accused CWM of

abusing its workers." *See* Second Amended Complaint, ¶ 163.  The full article reads:

**Immigrant Miners Take On Kingstons: They say the company took advantage of them, paid poorly and fired workers for trying to unionize Mike Gorrell and Rhina Guidos**
HUNTINGTON - Bill Estrada never aspired to be a labor activist before he spent a year digging coal at the Co-op Mine for less than $6 an hour.  Now he spends six hours a day on a picket line at a junction where the mine's access road branches off from state Road 31, a scenic bypass that climbs from the terraced base of Huntington Canyon to the top of the coal-rich Wasatch Plateau.
Estrada is supported by 68 to 75 miners, almost all Latino, who rallied to his cause after he was Co-op fired him Sept. 22 for trying to organize a union. The company maintains Estrada was insubordinate after being caught falsifying a safety inspection record.
His backers include Guillermo Hernandez who, after 22 years with Co-op, earns less than $8 an hour, with no pension or medical benefits.  And Celso Panduro, who contends he cannot afford to celebrate his son Daniel's upcoming third birthday because his $8 per hour wage barely covers the rent and food bills for his family of five.  And Ana Maria Sanchez, a 24 year-old single mom who claims the min-owning Kingston family did not provide separate restrooms or bathing facilities for the three women on the work force.
"We're very united," says Estrada, 37, who migrated from Los Angeles to Price, where his girlfriend had relatives.  "That's the one thing the company didn't count on.  They thought, 'They're Mexicans.  We can get rid of them ... They didn't figure that sooner or later, a group of workers would be able to find out what their rights are and to fight back for what's justifiable and what they deserve."
Charles Reynolds, personnel manager for CW Mining Co., the company's formal name, denies Co-op was taking advantage of the miners, most of whom hail from Sinaloa state in west-central Mexico.  "Our company does not discriminate in our hiring in any way.  We employ both Hispanic-Americans and anyone else who applies for a job, when we have an available opening," he says.
The miners' case is being investigated by the National Labor Relations Board at the request of the United Mine Workers of America (UMWA).  Once vibrant but now struggling, the union has made the Co-op miners a cause celebre. Their plight is evidence to the UMWA that modern workers remain subject to corporate mistreatment that most Americans thought was eradicated long ago - with immigrants still especially vulnerable to exploitation because of their limited English-speaking abilities and fears that deportation will face any complainers who enter the United States illegally.
Seven of the miners received a warm ovation Sept. 30 when they were introduced onstate at a union special convention in Las Vegas.  UMWA International President Cecil Roberts then issued a statement calling on American workers to support the miners "as they fight for justice and dignity."

14

Salt Lake City-based members of the AFL-CIO's Building Trades local union chapters responded with a food drive. Teaming with Utahns Against Hunger and Utah Jobs with Justice, a worker advocacy group, the union locals delivered four truckloads of canned vegetables, fruit, beans, tortillas, rice and other foodstuffs to the Co-op miners. *"It kind of makes you mad that somebody could abuse people that badly," says Corey Hilton, chairman of the Building Trades Organizing Project. "We don't want any kids going hungry."*

Unless the labor dispute goes on indefinitely, most food needs of the miners and their families should be covered by the Emery County Community Service food bank, operated in Castle Dale by the Southeastern Utah Association of Local Governments. But service coordinator Kathy Thomas says that with 30 families already having come to the food bank for assistance, "we're thinning out. That's a sizable number for a small area like this. We have donation sites all over the county so individuals can donate food if they like."

Thomas says her agency cannot help the miners meet rent payments or utility bills, assistance that will have to come from the UMWA or Catholic relief agencies.

Adding spice to the conflict is the fact that Co-op Mining is widely recognized as a holding of the polygamous Kingston family. Longtime UMWA International board member Mike Dalpiaz, Helper's former mayor, says that because of suspicions about the family's operations, "we are going to open this up and see what the Kingstons are doing on different playing fields. Somebody has to put an end to this."

For his part, Estrada says, "we're fighting this, not because they're a polygamous family but because of what they do at this mine. We want what's fair at that mine."

He says he heard grumbling about the low wages (average pay for a Utah coal miner is $12 per hour), lack of benefits and potentially dangerous working conditions from the day he started as a miner's helper. It did not take him long to perceive that the mine's so-called union, the International Association of United Workers, was a company concoction designed to preclude employees from airing legitimate grievances.

Estrada eventually became part of a group that arranged a meeting in late August with UMWA labor organizer Jim Stevenson, who urged the group to keep a low profile while electing a "leadership committee" that could advise workers of their rights under the National Labor Relations Act.

"They learned very quickly," Stevenson says of the miners, who Estrada claims stood up to their bosses twice last month when they threatened disciplinary action against two colleagues, Oscar Sosa and Juan Salazar, for alleged infractions of work rules.

Estrada says the showdown over Salazar occurred Sept. 19. When he returned to work the following Monday, a foreman confronted him, wanting Estrada to sign a form acknowledging a failure to perform his duties adequately. Estrada refused and the foreman fired him.

Co-op's Reynolds rejects Estrada's account, contending he knows nothing of "any organizing they were doing. It was simply in response to some problems they were having with him on the job."

The miners and the company disagree over what happened after that, too. The miners maintain that when they came to Estrada's defense, a foreman told them they were all fired. When some tried to return to work the next morning, only a handful of employees on a company checklist were allowed onto the property.

Reynolds contends the employees "simply walked off the job and have not returned."

Either way, the UMWA filed a grievance with the National Labor Relations Board (NLRB) on Sept. 23, accusing Co-op of intimidation and coercion in firing an employee for promoting unionization, creating a sham union controlled by the company and seeking immediate reinstatement of the miners with back pay.

Denver-based NLRB investigator Daniel Robles spent three days in Carbon and Emery counties a week ago, interviewing miners and company officials about the dispute. His boss, assistant regional director Wayne Benson, says that "because a lot of people have lost their jobs and these are important issues, we're giving it our utmost attention." He expects a ruling by mid-November.

Until that decision is rendered, Co-op's Reynolds said he was limited in how much he can say. But in comments to The Salt Lake Tribune and a letter to the Price Sun-Advocate, he argues that the International Association of United Workers union is legitimate, that the company offers health insurance through Ensign Company Group Health Plan to its employees although not all take advantage of it, that seemingly low hourly wages are boosted upward with supplementary pay for jobs well done and performance bonuses, that female employees have access to separate restrooms and bathing facilities, and that the company abides by federal and state safety regulations. Federal Mine Safety and Health Administration records support his last point, showing injury to incidence levels at Co-op mines that are below the national average.

The miners, nevertheless, remain steadfast in their determination to force the company to improve pay scales and working conditions.

While having three young children at home made it difficult for Panduro to stop working, he says he had to "because I couldn't close my eyes any more" to the ill treatment. Sanchez swears her resolve will not waver. "The day we united against the owners, it was because we had hit a wall. Every time we had asked for better working conditions, they told us to keep our heads down and keep working or we could out the door."

Their determination is inspiring to the UMWA's Dalpiaz, who contends that union and nonunion miners alike from Utah's coal country have called him, voicing support for efforts to help the Co-op miners. "It's taken some beat-down immigrant workers to make the rest of society stand up and say we can make changes." he says.

16

Mike Gorrell and Rhina Guidos, *Immigrant Miners Take On Kingstons*, S.L. Tribune, October 12, 2003, at A1. (emphasis on alleged defamatory statements).

Corey Hilton is Chairman of the Building Trades Organizing Project, not a Salt Lake Tribune reporter. The Salt Lake Tribune cannot be accused of defamation for a statement made by someone they did not employ. Plaintiffs' carelessness in charging the Salt Lake Tribune for these statements is more reckless than any statements published in the article.

Even if Mr. Hilton were a Tribune reporter, this statement cannot convey defamatory meaning. The full sentences reads: "'It kind of makes you mad that somebody could abuse people that badly,' says Corey Hilton, chairman of the Building Trades Organizing Project. "We don't want any kids going hungry." *Id.* Earlier in the article, the Tribune reported: "Charles Reynolds, personnel manager for CW Mining Co., the company's formal name, denies Co-op was taking advantage of the miners, most of whom hail from Sinaloa state in west-central Mexico." *Id.* The article also states:

> The miners and the company disagree over what happened after that, too. The miners maintain that when they came to Estrada's defense, a foreman told them they were all fired. When some tried to return to work the next morning, only a handful of employees on a company checklist were allowed onto the property. Reynolds contends the employees "simply walked off the job and have not returned."

*Id.* This article provides balanced analysis and affords a forum for CWM, as well as the miners, to state its views. The language in no way challenges the plaintiffs' reputation, nor does it suggest malice, and thus falls far short of stating a claim for defamation.

### 5. Union Vote to Exclude Kingston Relatives

Plaintiffs next allege:

The Salt Lake Tribune reporter Steven Oberbeck said, "Late last year, several dozen coal miners ... were fired and locked out of [CWM] after they protested

17

poor working conditions, low salaries and the lack of benefits. ... [T]he NLRB in July determined the miners were entitled to reinstatement to their jobs ..."

*See* Second Amended Complaint, ¶ 164. The full article reads:

### Union Vote to Exclude Kingston Relatives
### Steven Oberbeck

Struggling coal miners at the Kingston family-owned Co-Op mine in Huntington now can vote to join the United Mine Workers of America union without fear their voices will be drowned out by co-workers related to the polygamous clan. In a ruling handed down this week, the National Labor Relations Board (NLRB) in Denver determined workers at the mine who are related by blood or marriage to the Kingston family won't be allowed to vote on UMWA representation.

"This [ruling] is a good win for the UMWA, but more importantly, for those miners who waged a long hard fight after standing up for their rights," said Doug Gibson, a spokesman for the mine workers' union in Washington D.C.

However, the battle may not be over. "We feel the NLRB's ruling is discriminatory against a large portion of workers who deserve to participate," Co-Op Mine manager Charles Reynolds said. "We intend to appeal the NLRB's decision."

The company has maintained that the International Association of United Workers Union already represents the miners, but many of the workers describe that organization as a "yellow-dog" union with ties to the Kingstons.

In its ruling, though, the NLRB determined the International Association is a valid labor organization. In a future election, miners will be asked whether they want representation by the International Association, the UMWA or neither.

*Late last year, several dozen coal miners, mostly Latinos, were fired and locked out of the polygamous clan-owned mine after they protested poor working conditions, low salaries and the lack of benefits. They're trying to organize under the UMWA.*

Mine managers contended the miners refused to return to work after two miners were disciplined for job-related issues. "There was no lockout," Reynolds said then. "At any time, any of them could have returned."

*But the NLRB in July determined the miners were entitled to reinstatement to their jobs*, a ruling that may open the way for the miners to collect back pay for the time they were out of work. The NLRB still is investigating that possibility.

Many of the protesting miners have returned to work, but now they are laboring with the hope the UMWA eventually may be certified as their union and help in future collective bargaining with the company.

"We haven't won yet," said Bill Estrada, the miner who rallied the others last year after he was fired for union-organizing activity. "The next big thing for us to look forward to will be when the NLRB sets the date for the election."

Prior to the NLRB's ruling earlier this week, the miners feared Kingston family allies in the work force would vote in favor of the status quo and thwart

their efforts at UMWA representation.  "These were people who never applied for employment," Estrada contended.  "The family just brought them in."

    Gibson at the UMWA said were it not for the NLRB decision, Kingston family members working at the mine could have swayed the vote.  In its decision, the NLRB noted that based on the company's records, there were approximately 220 full- and part-time employees at the mine and that 156, or 71 percent, had ties to the family.

    The board found there were only 64 employees eligible to vote.  Included among that number were many of those who were locked out of the mine in September 2003.

    Estrada said support is overwhelming for UMWA representation.  "NOt all of the 64 [miners] remain at the mine.  Some have moved on and are working at other mines.  But of those remaining, support is strong for the UMWA," he said.

    NLRB Assistant Regional Director Wayne Benson in Denver said if the company wishes to appeal, it must request a review by the NLRB in Washington.  The order handed down this week indicates that request for review must be filed by Dec. 2.

Steven Oberbeck, *Union Vote to Exclude Kingston Relatives*, S.L. Tribune, November 20, 2004,

at A1.  (emphasis on alleged defamatory statements).

    Within the context of the article, the alleged statements fail to convey defamatory

meaning.  Prior to the alleged defamations, Mr. Oberbeck quotes a CWM spokesman extensively

and states CWM's position.  He writes:

    "We feel the NLRB's ruling is discriminatory against a large portion of workers who deserve to participate," Co-Op Mine manager Charles Reynolds said.  "We intend to appeal the NLRB's decision."  The company has maintained that the International Association of United Workers Union already represents the miners, but many of the workers describe that organization as a "yellow-dog" union with ties to the Kingstons.  In its ruling, though, the NLRB determined that the International Association is a valid labor organization.  In a future election, miners will be asked whether they want representation by the International Association, the UMWA, or neither.

*Id*.  Plaintiffs' position was afforded more space than the alleged defamation.  No reasonable

reader could read the alleged statements as being defamatory, much less malicious.

                              **6. Miners Win Back their Jobs; Miners March Back to Work After Settlement, Armed with a Settlement; and Miners Allege Union Busting**

Plaintiffs next allege:

The Salt Lake Tribune reporter Glen Warchol said:
a. CWM workers "were fired and locked out" of their jobs at CWM, and Estrada "rallied the others last year after he was fired for union-organizing activity."
b. 49 coal miners "climbed the canyon to demand their jobs back under a federal settlement," being a statement the workers (actually no more than 30 in number) were demanding their jobs, rather than merely accepting a unilateral offer of re-employment by CWM. He also said the workers "also won ... back pay."
c. The NLRB determined miners (who had walked off their jobs in 2003) were entitled to reinstatement to their jobs and, possibly, back pay.

*See* Second Amended Complaint, ¶ 165. Part (a), which claims defamation in the article Miners

Win Back their Jobs, is repeated from ¶ 162 of the Complaint. The reasons it fails to state a

claim for defamation have been discussed previously.

Part (b) of this allegation stems from an article entitled "Miners March Back to Work

After Settlement, Armed with a Settlement." The full article reads:

**Miners March Back to Work After Settlement, Armed with a Settlement:**
**Miners March to Claim Jobs Won in Deal**
**Glen Warchol**

   HUNTINGTON - *The march to the Co-op Mine on Tuesday was a throwback to better days of Utah union solidarity as 49 coal miners, who for 10 months have protested working conditions at the Kingston-owned mine, climbed the canyon to demand their jobs back under a federal settlement.* About 100 cheering supporters, including union miners from around the region, joined in the half-mile march.

   "This is nothing compared with what I've seen," said retired miner Tony Salazar, 76, who blocked the same canyon during a strike in 1949. "We stopped a truck and dumped a load of coal down there. Over toward the Book Cliffs, they burned a bridge to stop the coal from getting out. The union was very strong in those days."

   The protesting Co-op miners, most of them Latino, say the settlement reached last week through the National Labor Relations Board (NLRB) validated their claims that the polygamous Kingston clan fired and locked them out for trying to organize under the United Mine Workers of America (UMWA). *They also won an as-yet undetermined amount of back pay.*

   "This is a very happy day for the Co-op miners," said Bob Butero, a UMWA organizer. But he cautioned the miners and their supporters: "This is not over until these workers are covered by a true labor agreement."

   The mine's managers contend the miners refused to return to work after two miners were disciplined for job-related issues. "There was no lockout,"

20

Personnel Manager Charles Reynolds said. "At any time, any of them could have returned."

The miners will be called back for refresher training courses sometime this month, Reynolds said, then returned to their jobs. "The goal is to work with the employees to work out all our concerns."

An election is expected next month in which the miners will choose between the UMWA or the mine's existing union, the International Association of United Workers. The miners say the IAUW is a bogus, Kingston-controlled union.

But Chris Grumvick, the IAUW's representative, says his union is legitimate and that he is not a member of the Kingston family.

Nevertheless, it was the UMWA that represented the miners on their march to regain their jobs - not Grumvick. "I offered them representation. They refused it," he said.

Still, even Butero admits that the upcoming election is no sure thing. It will pivot on who the NLRB decides can cast votes. Owners, managers and supervisors are barred from voting in union elections, but it is a particularly murky situation at the Co-op mine.

The UMWA says the Kingston family members should not vote as workers. The NLRB will have to make a unique call on Kingston workers, Butero said.

"When these [Kingston members] go to work, they are part-owners of the mine," he said. "Can we get the boar to take the broader view to see that? We'll see."

Glen Warchol, *Miners March Back to Work After Settlement, Armed With Settlement,* S.L. Tribune, July 7, 2004, at A1. (emphasis on alleged defamatory statements). The allegations stemming from this article are composed of two sentences. The first sentence, concerning the actions of 49 coal miners, is merely a statement of what happened. The plaintiffs contend that only 30 miners participated and that those miners accepted a settlement rather than demanded their jobs back. The disputed number is irrelevant to defamation. Whether the number was 30 or 49, stating a number under these circumstances cannot possibly undermine the plaintiffs' reputation, and therefore is not defamatory. The question of settlement and marching is similarly misplaced. The article states that the miners "climbed the canyon to demand their jobs back under a federal settlement." This statement offers the miners' view of their actions. The miners' perspective cannot defame plaintiffs because it is an opinion. It doesn't concern facts that can be

21

objectively verified and whose publication could injure the plaintiffs. Moreover, the article

attempts to convey the plaintiffs' view of the events as well. It states:

> The mine's managers contend the miners refused to return to work after two miners were disciplined for job-related issues. "There was no lockout,'" Personnel Manager Charles Reynolds said. "At any time, any of them could have returned." The miners will be called back for refresher training courses sometime this month, Reynolds said, then return to their jobs. "The goal is to work with the employees to work out all our concerns."

*Id*. Considering the entire article, including the substantial portion dedicated to the plaintiffs'

position, no reasonable reader could infer defamation, much less malice.

The alleged defamation contained in Part (c) is similarly defective. The full article reads:

### Miners Allege Union Busting: They Claim Kingston Mistreatment in Weeks Before Vote; Kingston Miners Complain
### Glen Warchol

> Coal miners trying to organize a new union at the Co-Op Mine owned by the ploygamous Kingston family on Monday complained of dangerous conditions and worker intimidation at the mine near Huntington. Co-Op miner Bill Estrada alleges workers supporting the United Mine Workers of America have been threatened and, in one case, assaulted.
>
> "They are trying to use anything possible to defeat our attempt to organize with the UMWA," Estrada said. "They are taking desperate measures," including unrealistic work demands, threats to fire workers who cannot prove they are legally in the country and warnings they will close the mine if the UMWA wins the election set for Dec. 16.
>
> The miners also asked federal Mine Safety and Health Administration officials to order the mine's owner, C.W. Mining, to halt what the miners allege are dangerous practices that expose them to cave-ins and inadequate ventilation, Estrada said.
>
> A Co-Op Mine manager did not immediately return phone calls Monday.
>
> The National Labor Relations Board (NLRB) in Denver earlier this month ruled workers at the mine are related by blood or marriage to the Kingston family won't be allowed to participate in the union election.
>
> Co-Op management promised to appeal the decision, but NLRB assistant Regional Director Wayne Benson said he had yet to receive it. Coercion of employees attempting to organize is unlawful, he said. The NLRB has no reason to believe any of the approved voters have questionable social security numbers, Benson said.
>
> The company maintains the miners already are represented by a union, the Utah-based International Association of United Workers. Dissident miners say the United Workers is Kingston created and controlled.

22

The NLRB agrees the United Workers is a union - but says the miners have the right to choose which union will represent them - if any. Late last year, several dozen coal miners, mostly Latinos, claimed they were fired and locked out of the mine after they protested poor working conditions, low salaries and the lack of benefits.

Mine managers say the miners refused to return to work after two miners were disciplined for job-related issues. *The NLRB determined the miners were entitled to reinstatement to their jobs and, possibly, back pay.*

Based on the company's records, the NLRB found that 156 of the mine's 220 full- and part-time employees had ties to the family. Only 64 employees are eligible to vote.

Glen Warchol, *Miners Allege Union Busting*, S.L. Tribune, November 30, 2004, at E1.

(emphasis on alleged defamatory statements).

The statement that the NLRB found the miners were entitled to back pay and to return to their jobs, even if erroneous, does not attack the plaintiffs' reputation. It cannot seriously be argued that the Tribune planted one such statement within an article with the intent to attack the plaintiffs' reputation. Like the previous articles, this article also articulates the plaintiffs' position. It states:

The company maintains the miners already are represented by a union, the Utah-based International Association of United Workers. Dissident miners say the United Workers is Kingston created and controlled. ... Late last year, several dozen coal miners, mostly Latinos, claimed they were fired and locked out of the mine after they protested poor working conditions, low salaries and the lack of benefits. Mine managers say the miners refused to return to work after two miners were disciplined for job-related issues.

*Id.* The article provides perspectives from both sides of the labor dispute. No reasonable reader could infer defamation from one sentence describing the NLRB's findings.

### 7. *Striking Latino Miners Have Little to Celebrate This Year*

Plaintiffs next allege: "*The Salt Lake Tribune* columnist Tom Wharton falsely described the workers who walked off the job at CWM's mine as "part of an unfortunate American industry habit of exploiting immigrant workers." *See* Complaint, ¶ 166. The full article reads:

23

**Striking Latino Miners Have Little to Celebrate This Year**
**Tom Wharton**

"When the love of the poor shall one day turn to hate.
When the patience of the workers gives away.
Would be better for you rich if you never had been born'
So they laid Jesus Christ in his grave."
– Woody Guthrie

HUNTINGTON CANYON - Red Christmas lights surrounded the portrait of the Virgin of Guadulupe inside the weathered old trailer on the road to the Co-op Mine. On the feast day of the Virgin during the height of the Christmas holiday season, the striking miners have little to celebrate.

Like the Greeks, Chines, Italians, Irish and Czechs before them, the mostly poor Latino miners are battling mine owners for basic rights such as safety, a living wage, a pension and health insurance. The striking miners sit inside a trailer donated by a retired coal-country miner. Coffee, leche and tortillas sit at the ready. A deck of worn cards waits for a late-night game.

They may not have heard of Woody Guthrie or his union songs, written in a different time. They might not know about Utah's own union history, well documented in the nearby Helper Mining and Railroad Museum. But *they are part of an unfortunate American industry habit of exploiting immigrant workers.*

"The piano played a slow funeral tune
And the town was lit up by a cold Christmas moon,
The parents they cried and the miners they moaned,
See what your greed for money has done."
– Woody Guthrie

Hand-lettered signs, in English and Spanish, tell a story to those who drive past the striking miners. "Co-op Miners Demand Dignity and Respect from the Kingstons" reads one sign, referring to the family that owns the Co-Op Mine.

Talk to folks in Emery County and you will find support for the miners' cause. While only one mine in the Carbon and Emery coal country - the Deer Creek - remains unionized, the difference in the wages alone speaks to how the workers at the Co-Op are being exploited.

The approximately 75 miners who went on strike Sept. 22 made between $5.25 and $7 an hour; other mines in the area pay $15 to $20. "Why do they have to be different?" asked Bill Estrada, one of the striking miners. "Why not operate like other companies or offer wages compared with other companies?"

Estrada talked about unsafe conditions in the mines, about injured miners who have had their pay docked when they dared report an accident.

"Oh, you can't scare me, I'm sticking to the union,
I'm sticking to the union till the day I die."
– Woody Guthrie

The drama between the mine bosses and the union members plays out like a history lesson from early in the 20th century during the height of the union movement. Estrada talks about hearing threats the mine owners might call immigration officials to scare the workers. The Kingstons have called the sheriff,

reporting illegal, trespass. At night they flash their high beams into the faces of those on the picket line.

The miners want their jobs returned and back pay for being illegally fired for union activity. "Any group of people willing to stand up for justice and what's right, only good things can come," said Estrada. "We haven't won. But we trust each other. They never thought we could get together."

Woody Guthrie would be proud.

Tom Wharton, *Striking Latino Miners Have Little to Celebrate This Year*, S.L. Tribune, December 20, 2003, at B1. (emphasis on alleged defamatory statements).

Defamation cannot rest upon facts that are true. This alleged defamation is a conclusion that the author bases upon facts described in the article. The Plaintiffs do not dispute the truth of the facts upon which the author's conclusion is based. Among the facts the author uses to support his conclusion are, "The approximately 75 miners who went on strike Sept. 22 made between $5.25 and $7 an hour; other mines in the area pay $15 to $20;" "'Why do they have to be different?' asked Bill Estrada, one of the striking miners. 'Why not operate like other companies or offer wages compared with other companies?'" *Id.* Nothing in this article's underlying facts suggests that a reasonable reader could find them defamatory. The plaintiffs have not claimed that these facts are false and a reasonable person could easily conclude from these undisputed facts that the miners are being exploited.

Even if the facts and their resulting conclusion could be defamatory, the statement that the miners are part of an American industry habit of exploiting immigrant workers is a broad social commentary aimed at industry in general, not the plaintiffs. The author is a newspaper columnist writing a column, not a hard news story. In a recent dissenting opinion, Justice Brennan noted, "While signed columns may certainly include statements of fact, they are also the "well recognized home of opinion and comment"." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 32 (1990) (Brennan, J. dissenting) (citations omitted). Justice Brennan further stated, "Certain

25

formats - editorials, reviews, political cartoons, letters to the editor - signal the reader to

anticipate a departure from what is actually know by the author as fact." *Id.* Defamation,

however, is not a broad sword; it is a scalpel. It is aimed at redressing published comments that

are false and harm specific individuals. It cannot be used by businesses to inhibit reporters from

drawing broad conclusions on matters of clear social importance.

### 8. Victory for Miners

Plaintiffs next allege:

> *The Salt Lake Tribune* said, "The miners won the right to return to their jobs,
> [and] get back pay ... For the miners and UMWA, it was a glimpse into the past,
> where "Historically, immigrant workers were easier for employers to exploit.
> Today, companies can threaten to turn noncompliant workers over to immigration
> authorities. ... History, it seems, is repeating itself in Utah's coal country."

*See* Second Amended Complaint, ¶ 167. The full article reads:

**Victory for Miners**
        Mining coal underground is dirty, dangerous, debilitating work. No one
should have to do it for $5.25-$7 an hour. It is little wonder, then, that the
workers at the Co-Op Mine near Huntington tried to organize themselves to
negotiate better pay and working conditions. When they talked about forming a
union last September, they say, their leader was fired and the rest of them were
locked out.
        The company - CW Mining, owned by the polygamous Kingston clan -
claims that it fired for insubordination the worker who was talking up the union,
and the rest of the miners left their jobs in sympathy. They were never locked out,
the company says.
        The dispute ended up in the lap of the National Labor Relations Board,
which finally facilitated a settlement this month. The miners won the right to
return to their jobs, get back pay and hold an election to determine whether they
will be represented by the United Mine Workers of America, by a rival union
affiliated with the company, or by no union at all.
        The settlement was a victory for the miners and the UMWA, which had
taken the miners' complaint about unfair labor practices to the NLRB.
        For the miners and the UMWA, it was a glimpse into the past. Beginning
late in the 19th century, the mines and unions in Utah's coal country grew up on
the backs of immigrant labor. By no coincidence, most of the miners at the Co-
Op Mine today are Latinos, many of them Mexicans.
        Historically, immigrant workers were easier for employers to exploit,
because of language and cultural barriers. Today, companies can threaten to turn

noncompliant workers over to immigration authorities. That is the environment
that gave birth to trade unionism, in Utah as well as elsewhere.

In recent decades, however, the state's coal industry around Price has
declined, and trade unionism has slowly eroded along a parallel track. U.S. labor
unions have discovered, however, that their future lies not far from their roots, in
immigrant labor. That pattern is playing itself out near Huntington.

If the miners' claims about low pay and benefits, about inadequate safety
training and poor working conditions are as they appear, it is no surprise that they
would organize to improve their lot. They have little other recourse.

History, it seems, is repeating itself in Utah's coal country.

S.L. Tribune, Editorial, *Victory for Miners,* July 10, 2004, at A8. (emphasis on alleged

defamatory statements).

Because the alleged defamations are contained within an editorial, the facts upon which

the allegedly defamatory opinions are based must meet the requirements for defamation in order

to sustain a claim of defamation.

The only fact alleged to be defamatory is the statement, "The miners won the right to

return to their jobs, [and] get back pay." *Id.* The plaintiffs pulled this statement from the

following paragraph:

The dispute ended up in the lap of the National Labor Relations Board, which
finally facilitated a settlement this month. *The miners won the right to return to
their jobs, get back pay* and hold an election to determine whether they will be
represented by the United Mine Workers of America, by a rival union affiliated
with the company, or by no union at all.

*Id.* (emphasis on alleged defamatory statement). Viewed in light of the entire paragraph, no

reasonable reader could infer defamation from this statement. First, the preceding statement

plainly states that the dispute was settled. Second, the plaintiffs allege that only a portion of a

sentence is defamatory. That portion merely states the posture of the settlement. It does not

undermine the plaintiffs' reputation, thus it cannot convey defamatory meaning as a matter of

law. Finally, it is devoid of malice. No reasonable reader could infer from these statements that

the Salt Lake Tribune intended to impugn the plaintiffs' character or reputation.

27

### Conclusions for the Salt Lake Tribune

Plaintiffs' allegations against the Salt Lake Tribune fall far short of the requirements for defamatory meaning, much less malice under *Linn*. The plaintiffs fail to address those portions of the articles which articulate their perspectives. Rather, their complaint seeks to punish the Salt Lake Tribune for publishing any opinions that differ from their own. Because plaintiffs' claims are unfounded and seem aimed only at imposing costs on the Court and intimidating their opponents, the defamation claims against the Salt Lake Tribune are dismissed and plaintiffs are ordered to pay the Salt Lake Tribune a reasonable attorneys' fee.

### B.    The Deseret Morning News

Plaintiffs also allege that the Deseret Morning News defamed them on several occasions. As with the Salt Lake Tribune, the plaintiffs have failed to include those portions of the articles that undermine their claims. The Court will examine each allegation in turn.

#### *1. Kingstons' Treatment of Miners is Appalling*

Plaintiffs claim:

> *The Deseret Morning News* editorial writer Marjorie Cortez said workers'
> complaints about unsafe working conditions and a move to organize a union cost
> them their jobs, and that the workers "want a union to represent their interests,"
> meaning IAUWU did not represent the interests of its bargaining unit. She also
> said "The wages paid these men is an outrage. Some in the labor movement go so
> far as to call it a human rights violation. At a minimum, these men have been
> horribly exploited." Cortez published a false statement earlier reported in the
> Arizona Republic, that "two Kingston Clan sons ... were expected to work in the
> family mine as young as 12 years old."

*See* Second Amended Complaint, ¶ 169.

The full article reads:

**Kingstons' Treatment of Miners is Appalling**
**Marjorie Cortez**

28

Minimum wage in Utah is $5.15 an hour.  Minimum wage buys minimum-wage work-mostly low-end service sector jobs that are the domain of high school or college students and unskilled adults.

Considering that today's minimum wage is more than twice what I earned in my first forays into the world of work 25 years ago, $5.15 doesn't seem an unreasonable wage for such jobs, even when adjusted for inflation.  But it's an appalling wage range for an underground coal miner.

That's right.  When Bill Estrada was employed by Co-Op Mine in Huntington, Utah, his hourly wage was $5.75 an hour after a year on the job.

Estrada was one of the lower-paid employees.  Some of the higher-paid employees earned $8 an hour at the mine, which is owned by the Kingston family.  The going rate for mining jobs or other "natural resource production" jobs, according to the Bureau of Labor Stastices' 2002 data, was $17.22 an hour.

I refer to these men's employment in the past tense because they are no longer employed by the mine.  Their complaints about unsafe working conditions and a move to organize a union cost them their jobs.  National labor organizers say Estrada and approximately 74 others were illegally fired from their jobs.

One gets the distinct impression that the owners of the Co-Op Mine never figured that anyone would challenge their authority.  The miners, who are mostly Mexican nationals, have manned a round-the-clock picket line at the mine since losing their jobs last fall.  They believe they deserve a decent wage and safer working conditions.  *They want a union to represent their interests.*

If there was ever justification for the need for organized labor, this could be the textbook case.  *The wages paid these men is an outrage.  Some in the labor movement go so far to call it a human rights violation.  At a minimum, these men have been horribly exploited.*

*Published reports suggest this wasn't an isolated incident.  In 2003, the Arizona Republic reported that two Kingston Clan sons who had abandoned the fold were expected to work in the family mine as young as 12 years old.*

"As soon as I would get home from public school, we would go work in the mine from 5 p.m.  The bosses also worked us on holidays because they knew the state wouldn't be inspecting those days," Louis Brown told the Arizona Republic.

I realize I'm trampling on a lot of sensitive areas here.  Organized labor is frowned upon in Utah.  I'm sure there are some people (hopefully few) who think it's OK to work young kids in the family coal mine in the mane of "parental rights."

Then there's the polygamous lifestyle of the Kingstons or the fact that most of these workers are in the United States illegally.

Still, if this were a movie script, I'd send it back for substantial rewrites because no one in his right mind would believe that any coal miner in the United States of America would earn $5.75 an hour in 2004.

Polygamy?  It's too much for mainstream America to fathom.

For far too long, law enforcers and other government agencies have been reticent to hold polygamists to account for illegal conduct.  It's messy business,

29

although in recent years some prosecutors and agency heads have waded into the issue.

      The mine workers in this case were the perfect stooges because they were too afraid to involve the authorities for fear they would be deported. As individuals, they lack the clout that an organized group would have. Many of their complaints have fallen on deaf ears or become mired in federal bureaucracy.

      No doubt, if Bill Estrada and co-workers had legal status, they wouldn't be working in a coal mine for less than $10 an hour. But there's no magic wand to fix the immigration problem, although this case illustrates why it needs fixing and anyone who believes America's service sector could get by fine without the labors of illegal immigrants needs a serious reality check. Workers deserve to be treated with dignity.

      The Co-Op miners need that and a whole lot more. They need a bargaining unit to help ensure they are fairly compensated for the dirty dangerous work they have performed. As a matter of human rights, I hope they get one.

Marjorie Cortez, *Kingstons' Treatment of Miners is Appalling*, Deseret Morning News, March 27, 2004, at A15. (emphasis on alleged defamatory statements).

      The alleged statements lack defamatory meaning for several reasons. The first allegation concerns the statement that workers "want a union to represent their interests." *See* Second Amended Complaint, ¶ 169. This statement merely represents the miners' position. It does not attack the plaintiffs' reputation. Furthermore, stating the miners' position lacks the requisite malice under *Linn*. Even plaintiffs' allegation, that this statement meant "IAUWU did not represent the interests of its bargaining unit," does not allege malice. *See* Complaint, ¶ 169. It simply alleges plaintiffs' counterposition, and this fails to state a claim for defamation.

      The second statement calls the wages an outrage and exploitative and says that some have called it a human rights violation. The plaintiffs do not dispute the underlying facts of these claims, namely the wage amounts, which the article reports were $5.75 an hour. *Id.* As stated earlier, editorialists may draw conclusions on important social issues based on undisputed facts. No reasonable reader could infer malice from an editorialist's conclusion based on an undisputed wage.

The third statement concerns a report published in the Arizona Republic that 12-year old

boys were required to work in the mine.  No reasonable reader could conclude from this

statement that the Deseret Morning News intended to injure the plaintiffs' reputation.

### 2.  *Miners Plan to Return to their Jobs*

Plaintiffs next claim:

*The Deseret Morning News* reporter Tiffany Erickson said, "Striking miners in
central Utah are now making plans to return to their jobs after being fired and shut
out of a polygamous clan-owned mine. ...[NLRB] ordered that their jobs be
reinstated ... [UMWA], the group organizing the strike against the Co-op mine in
Huntington, is calling the labor board's decision a major breakthrough. They
received a draft settlement from the board that orders C.W. Mining Co. to
reinstate all miners who were illegally fired.  Last September, 75 coal miners were
fired from their jobs at the Co-op mine owned by C.W. Minting in Emery
Cournty. ... The labor board's decision also includes a back pay order."

*See* Second Amended Complaint, ¶ 170.

The full article reads:

**Miners Plan to Return to Their Jobs**
**Tiffany Erickson**
>    *Striking miners in central Utah are now making plans to return to their
> jobs after being fired and shut out of a polygamous clan-owned coal mine.*
>    In nine months of striking, the workers picketed, traveled the country
> speaking at other union gatherings and gained national and international support
> for their cause.  On Thursday, it all paid off when *the National Labor Relations
> Board ordered that their jobs be reinstated*, and they plan to march to the mine on
> Tuesday to inform management they are returning.
>    *United Mine Workers of America, the group organizing the strike against
> the Co-Op mine in Huntington, is calling the labor board's decision a major
> breakthrough.  They received a draft settlement from the board that orders C.W.
> Mining Co. to reinstate all miners who were illegally fired.*
>    *Last September, 75 coal miners were fired from their jobs at the Co-Op
> mine, owned by C.W. Mining in Emery County.*  They were fired after contacting
> the United Mine Workers about getting a union organized at the mine, said
> Alyson Kennedy, a member of the strikers' leadership committee.
>    "We wanted safer conditions, better pay and benefits; in my opinion no
> coal miner should have to work for minimum wage," Kennedy said.  The miners
> were paid between $5.25 and $7 an hour with no benefits.
>    A company union has exited at the mine for many years, but all of the
> officers are bosses and are related to the Kingstons, the wealthy polygamous

31

family that owns the mine, Kennedy said.  Before the strike those who contacted the United Mine Workers of America were cornered, harassed and even suspended by the mine's management, she said.

John Kingston has said previously that the 74 miners fired last September staged an "illegal walkout." A phone number for the Kingstons went unanswered Saturday.

The decision, announced on Thursday, states that any type of intimidation or harassment of pro-union miners by the Co-Op management is illegal.

Though the miners, most of them Mexican immigrant workers, have their jobs back, Kennedy said, the fight is not over yet as they will be returning to poor wages, minuscule benefits and unsafe working conditions.

"We are determined to get a real union at this mine, a union contract where the wages and benefits are all negotiated and agreed upon by the workers," Kennedy said.

United Mine Workers has already petitioned the National Labor Relations Board to allow it to represent the miners in contract negotiations.  A union election also is scheduled sometime in August in which the miners will choose to be represented by the United Mine Workers of America, the mine's existing union, the International Association of United Workers or no union.

*The labor board's decision also includes a back pay order*, the exact details of which are being negotiated and may be settled in court.

Nine months can be a long time to go without pay, but the strikers received donations and support from all over the world, including unions in New Zealand, Australia and Britain, Kennedy said.

"It wasn't easy, but nobody suffered hardship," she said.  "We really had solidarity and that's the only way you can do things like this."

Many of the workers got jobs at surrounding mines during the strike while others dedicated all their time to it.  Besides large donations from other unions, assistance from the Catholic Church and United Mine Workers, strikers also helped each other out when things got tight.

This Tuesday the strikers will march together to the mine office and then attend a celebration of their victory at Huntington Town Hall.  They plan to be back to work on July 12.

Tiffany Erickson, *Miners Plan to Return to their Jobs*, Deseret Morning News, July 4, 2004, B1.

(emphasis on alleged defamatory statements).

Like many of the other alleged defamations, these statements merely express the miners'

position in the labor dispute.  Within the same article, the Deseret Morning News states the

plaintiffs' position as well.  Ms. Erickson writes, "John Kingston has said previously that the 74

miners fired last September staged an "illegal walkout."  A phone number for the Kingstons went

unanswered Saturday." *Id.* Given this context, no reasonable reader could infer malice from the

alleged defamatory statements. The alleged defamations do not undermine the plaintiffs'

reputation and they contain nothing to suggest malice on the part of the reporter or the Deseret

Morning News. For these reasons, the allegation fails to state a claim for defamation.

### 3. *Kingstons Exploitative, Protestors Say*

Plaintiffs next claim:

*The Deseret Morning News* reporter Elaine Jarvik said, "The miners [were] fired
last September after they complained about what they said were unsafe conditions
...", and Estrada "was among 75 workers who staged a walkout at the Co-op Mine
in Huntington and were later fired" because CWM "did not want the miners to
unionize."

*See* Second Amended Complaint, ¶ 171.

The full article reads:

**Kingstons Exploitative, Protestors Say: Fired Miners, Others Say Clan
Mistreats Workers**
**Elaine Jarvik**
      A dozen fired miners and more than 50 of their supporters waved picket
signs Saturday in front of Salt Lake-area businesses owned by the Kingston
polygamous clan.
      *The miners, fired last September after they complained about what they
said were unsafe conditions* at the Kingston-owned Co-Op mine in Emery
County, spend most of their days now picketing at the mine entrance. This
weekend they traveled to South Salt Lake to join in a protest at Kingston-owned
Standard Restaurant Supply and Spiffy Ice, 3500 S. West Temple St.
      "The Kingstons own 160 businesses," said protester Dave Sharp. "We're
going to do them all."
      Sharp is a member of Utah Jobs With Justice, a coalition of about 20
labor, faith-based and community organizations promoting workers' rights. In
late November the group picketed the Kingston-owned Family Stores on
Redwood Rd.
      The miners and their allies are also planning a rally on Saturday, Feb. 7,
that will draw longshoreman from northern California, students from Los Angeles
and miners from around the West, *according to mine worker Bill Estrada. He
was among about 75 miners who stages a walkout at the Co-Op Mine in
Huntington and were later fired. The company, he said, did not want the miners
to unionize.*

The workers are protesting what they say are exploitative conditions, including defective machinery that has caused injuries, a lack of training and health-care benefits, and meager wages. The miners, many of them Mexican immigrants, start at minimum wage, Estrada said, "and to get a raise, you have to beg, sometime to get a raise of 25 cents."

"They're bullies and we don't like bullies," said protester Ken Wulle of Utah Jobs With Justice and the Disabled Rights Action Committee.

The miners are demanding reinstatement of all fired workers, recognition of the United Mine Workers of America as their collective bargaining agent, and back pay for the time they have been on strike.

Across West Temple, Buddy Beck of th Paper, Allied-Industrial, Chemical and Energy Workers union yelled cheers and chants from a bullhorn: "Kingstons, you can run but you can't hide" and "An injury to one is an injury to all."

Saturday's protesters included members representing such disparate unions as the International Brotherhood of Boilermakers and the American Federation of Musicians, as well as students and at least one professor. University of Utah economics professor Hans Ehrbar said that last semester one of the possible term paper topics in his class was "Kingston economics," which he described as "capitalism in an overstated, caricaturized form."

"This is not rocket science," said Westminster College student Richard Wagner about the miners' demands. "They want decent wages. And simple human dignity." The Kingston family, he said, "is like a corporation. To not be able to pay a decent living wage doesn't seem honorable."

The Kingstons were unavailable for comment Saturday.

Elaine Jarvik, *Kingstons Exploitative, Protestors Say*, Deseret Morning News, January 18, 2004, B2. (emphasis on alleged defamatory statements).

This allegation, too, is comprised of pieces from an article and fails to paint a complete picture. The allegation implies that the Deseret Morning News reported that CWM did not want the miners to unionize; however, that statement is attributed to Bill Estrada in the article. The full sentence reads, "The company, he said, did not want the miners to unionize." *Id.* Once again, plaintiffs were given the opportunity to express their position, however, "The Kingstons were unavailable for comment Saturday." *Id.* These statements voice the position of the miners. No reasonable reader could find defamatory meaning from the use of these statements. Viewed in their entirety, these statements fall short of the requirements for stating a claim for defamation.

### *4. Co-Op Miners Say Battle Has Just Begun*

Plaintiffs next claim:

*The Deseret Morning News* reporter Jennifer K. Nii said, "Ana Maria Sanchez had only worked at the mine for a month when she was fired for aligning with pro-unionizers.

*See* Complaint, ¶ 172.

The full article reads:

**Co-op Miners Say Battle Has Just Begun**
**Jenifer K. Nii**
    HUNTINGTON - Forty-nine of the 74 workers who were fired from the C.W. Mining Co. nine months ago submitted their acceptance notices on Tuesday to return to work. But, they say, the battle for their rights has just begun.
    The National Labor Relations Board issued a settlement agreement late last month, resolving the case filed by the United Mine Workers of America on behalf of the workers. The NLRB is the agency charged with enforcing the National Labor Relations Act. In it, the miners claimed they were illegally fired for seeking representation from the UMW. They also argued that they were intimidated and subjected to hazardous working conditions and low pay.
    While they called the NLRB settlement a win, the miners said Tuesday that getting their jobs back is the first step. At a rally at a park here, a group of about 100 people, including workers, union organizers and community groups, marched the workers' reinstatement acceptance notifications up the long hill to the Co-op Mine, chanting "Union Now!"
    "We want to let everybody know that we're coming back stronger than on Sept. 22 (the day the workers say they were fired)," said miner Juan Salazar. "Now we know our rights. We will not be intimidated."
    Under the terms of the agreement, the miners will return to work Monday, reinstated to their former, or substantially equivalent, jobs. The agreement stipulates that workers can negotiate for back pay, which they say they will do. They also say they will continue to press for union elections, which they expect will be held in August.
    "United Mine Workers understands that this struggle, this fight, is nowhere near over, that it is in its infancy," said UMW organizer Bob Butero. "This is not a total victory until these workers get covered by a true labor agreement."
    *Ana Maria Sanchez had only worked at the mine for a month when she was fired for aligning with the pro-unionizers.* However, she said, tensions had been brewing and peaked in late September.
    "For days before that, even, we were protesting the conditions at the mine - which added fuel to the fire," Sanchez said, through a translator. Sanchez said there were no bathroom facilities for female workers, that the roof of the mine was

35

in "cave-in condition" and that workers were not provided with proper safety or work equipment. Or, if they were, she said, "it was at an outrageous price," charged by the company.

The settlement stipulates that the mine does not admit to any unfair labor practice. On Tuesday, C.W. officials continued to assert that their miners are paid fairly and that the mine stands up to safety requirements.

"They have made several allegations, all of which have been investigated by MSHA (the Mine Safety and Health Administration), which concluded that there were no safety violations," said Charles Reynolds, C.W. Mine's personnel manager. "We have an excellent record with MSHA, which can be verified."

In addition, Reynolds said, "Some of the employees who did have complaints brought their complaints to us. The majority did not."

When asked about the miners' wages, Reynolds said workers are paid on a scale, based on skill level and experience. While the scale allows for wages as high as $18 per hour, Reynolds said that many of the affected workers were closer to the $5.75 per-hour minimum - which he attributed to workers' lack of experience.

"A lot of these guys, they come in from Mexico totally inexperienced, like I was totally inexperienced," said Chris Grundvig, a C.W. Mine mechanic and International Association of United Workers Union miners' representative. "I don't think any mine in the country would have paid me, or them, $20 an hour ... They make higher wages once they've been here a while."

C.W. asserts it already has an exclusive collective bargaining agreement with its workers through the IAUWU, and that workers should seek representation there, instead of from the United Mine Workers.

"I offered them representation," said Grundvig. "They don't want it."

Grundvig said C.W.'s IAUWU membership currently includes up to 100 active miners, and he maintained under heavy criticism from the striking miners that the union is a legitimate, legally established association acting on behalf of workers. The strikers alleged that the union is nothing more than a "yellow dog," a puppet organization for its owners, the polygamist Kingston clan.

"Code Pink supports the miners strike against this heinous polygamist engine of the Kingstons," said Susan Vogel, a member of Code Pink, a women-initiated social justice advocacy group. "They treat women, children and workers like garbage, and the way they've treated these miners is an example of that. The dedication and perseverance of these miners should be an example for workers everywhere. They fought to be treated like human beings and demanded a living wage."

Lupe Payan, one of the workers laid off in September, said he found work at another mine nearby. His new job includes benefits, insurance and paid holidays, he said.

"The other mine is more better, safer," Payan said. And, while he supported the workers' push to affiliate with the UMW, Payan said, "I am not coming back (to work at C.W. Mine). No."

Jenifer K. Nii, *Co-Op Miners Say Battle Has Just Begun,* Deseret Morning News, July 7, 2004,

E1. (emphasis on alleged defamatory statements).

This statement fails to state a claim for defamation. It was attributed to Ms. Sanchez and

it aims to state the position of each party involved in the labor dispute. The alleged defamation

consists of one sentence in which Ms. Sanchez states her view of losing employment at CWM.

The article devotes seven full paragraphs to the plaintiffs' position. Mr. Grundvig and Mr.

Reynolds explain why the plaintiffs took the actions they did. It is disingenuous for plaintiffs to

allege defamation based on one sentence in which a party to the labor dispute states her position

when the same article plainly states the plaintiffs' position in much greater detail. No reasonable

reader would believe this statement attacks the plaintiffs' reputation. Moreover, there is no

indication, nor allegation, of malice, as is required under *Linn.*

### 5. Victory is First Step for Miners

Plaintiffs claim:

> The Deseret Morning News said, "The miners ... were fired from their jobs last
> fall for attempting to organize a union ... The National Labor Relations Board has
> said the mine owners ... fired the miners illegally. The NLRB said the miners
> should be reinstated ... The NLRB validated the miners' contention that they were
> fired illegally ... This victory was a result of the miners' dogged determination ...
> and the assistance of local, state and international union activists, religious leaders
> and volunteers dedicated to the cause of social justice ..."

*See* Second Amended Complaint, ¶ 173.

The full article reads:

**Victory is First Step for Miners**
> Come Monday, some 50 former employees of C.W. Mining's Co-Op Mine
> in Emery County will return to work. *The miners, most of them Mexican
> nationals, were fired from their jobs last fall for attempting to organize a union to
> address poor pay and mine safety issues.*
> *The National Labor Relations Board has said the mine owners - members
> of the Kingston clan - fired the miners illegally. The NLRB said the miners*

37

*should be reinstated*, that they can negotiate for back pay for the duration of the lockout and then can freely participate in union activities.

These events are positive developments in an ongoing effort to ensure that coal miners have safe working conditions and are fairly compensated. But the miners' saga is far from over. They will require the continuing support of organizations and private citizens who have assisted them and their families since they lost their jobs nearly 10 months ago.

Although *the NLRB validated the miners' contention that they were fired illegally*, they will return to the same working conditions and the same pay which is paltry by industry standards. The miners were paid between $5.75 to $7 an hour to work in the underground mine outside Huntington. C.W. Mining Co. officials say the wages paid the miners is commensurate with their work histories. Some of them had no mining experience.

According to the Bureau of Labor Statistics, the prevailing wage for mining or other "natural resource production" jobs in the West is about $18 an hour.

Company officials dispute the workers' claims that the Co-op Mine is unsafe, citing Mine Safety and Health Administration reviews that concluded there were no safety violations.

Meanwhile, the United Mine Workers of America has petitioned the NLRB to represent the miners in contract negotiations. An election will be conducted later this summer during which the miners will choose between the UMWA, the International Association of United Workers (the existing union at the mine) or no union representation.

While the NLRB settlement is an important step in the miners' ordeal, the agreement includes a "non-admission clause," which means the mine does not admit to any unfair labor practices.

Next week, the miners have an opportunity to start fresh and, one hopes, negotiate a contract with the mine owners that ensure them a living wage and safe working conditions. Considering that *this victory was a result of the miners' dogged determination* (illustrated by their round-the-clock picket at the mine since the lockout began last fall), *and the assistance of local, state and cause of social justice*, ongoing attention will be required to ensure that the Co-op miners achieve the dignity they seek.

Deseret Morning News, Editorial, *Miners Plan to Return to their Jobs*, July 8, 2004, A8.

(emphasis on alleged defamatory statements).

Like previous allegations, this allegation contains sentences picked from the article and conveniently excludes statements favorable to the plaintiffs. Standing alone, the alleged statements fail to attack the plaintiffs' reputation and no reasonable reader could infer defamatory meaning from them.

Even if defamatory meaning and malice could be found, such effects would be dulled when the statements are viewed in context. The allegations conveniently omit references to the plaintiffs' position in the labor dispute, such as, "C.W. Mining Co. officials say the wages paid the miners is commensurate with their work histories. Some of them had no mining experience." *Id.* The article further states, "While the NLRB settlement is an important step in the miners' ordeal, the agreement includes a "non-admission clause," which means the mine does not admit to any unfair labor practices." *Id.* Viewed in context with these statements, no reasonable reader could find defamatory meaning or malice.

### Conclusions for the Deseret Morning News

Plaintiffs' allegations against the Deseret Morning News fall short of the requirements in Utah for defamatory meaning, much less malice under *Linn*. Their complaint seems aimed at intimidating the newspaper and any other party that does not agree with their point of view. For these reasons, plaintiffs' claims against the Deseret Morning News are dismissed and the Court orders plaintiffs to pay the Deseret Morning News a reasonable attorneys' fee.

   C.   **The Statements Published by the Salt Lake Tribune and Deseret Morning News are Protected by the Neutral Reportage Privilege**

The U.S. Supreme Court restricted the use of a constitutional privilege in cases involving private individuals in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974). The Court concluded that "the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.*, at 347.

The Utah Supreme Court recently recognized a neutral reportage privilege in *Schwarz v. Salt Lake Tribune*, 2005 WL 1037843 (UT App.). In that case, the Court ruled that "[t]he article is covered by the neutral reportage privilege because it contains "accurate and disinterested

39

reporting" of the information contained in the record." *Id.*, *quoting Edwards v. National Audubon Soc'y*, 556 F.2d 113, 120 (2d Cir. 1977). Even if the statements published by the Salt Lake Tribune and Deseret Morning News could convey defamatory meaning, they would be protected by the neutral reportage privilege. In *Edwards*, the Second Circuit Court of Appeals ruled that the neutral reportage privilege shields the press for statements it reports in good faith, whether they are true or false. In that case, the Court stated:

> We do not believe that the press may be required under the First Amendment to suppress newsworthy statements merely because it has serious doubts regarding their truth. Nor must the press take up cudgels against dubious charges in order to publish them without fear of liability for defamation. (Citations omitted). The public interest in being fully informed about controversies that often rage around sensitive issues demands that the press be afforded the freedom to report such charges without assuming responsibility for them.

*Edwards v. National Audubon Soc'y*, 556 F.2d 113, 120 (2d Cir. 1977). The Court then defined the boundaries of the neutral reportage privilege, stating:

> The contours of the press's right of neutral reportage are, of course, defined by the principles that give life to it. Literal accuracy is not a prerequisite: if we are to enjoy the blessings of a robust and unintimidated press, we must provide immunity from defamation suits where the journalist believes, reasonably and in good faith, that his report accurately conveys the charges made. *Time, Inc. v. Pape*, 401 U.S. 279 (1971). It is equally clear, however, that a publisher who in fact espouses or concurs in the charges made by others, or who deliberately distorts these statements to launch a personal attack of his own on a public figure, cannot rely on a privilege of neutral reportage. In such instances he assumes responsibility for the underlying accusations.

*Id.* (Citations omitted).

Whether the privilege shields the publisher depends upon whether the individual was a public or private figure. In *Gertz*, the U.S. Supreme Court noted that "Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in

protecting them is correspondingly greater." *Gertz v. Robert Welch, Inc.*, 418 U.S. at 344.  The

Court then described who would qualify as a public figure, stating:

> For the most part those who attain this status have assumed roles of especial
> prominence in the affairs of society.  Some occupy positions of such persuasive
> power and influence that they are deemed public figures for all purposes.  More
> commonly, those classed as public figures have thrust themselves to the forefront
> of particular public controversies in order to influence the resolution of the issues
> involved.

*Id.*, at 345.  The Utah Supreme Court later elaborated on the definition of public figures in

*Madsen v. United Television, Inc.*, 797 P.2d 1083 (Utah 1990).  In *Madsen*, a police officer

claimed to have been defamed "by news reports that included allegations that he had a poor

record within the police department; that he was in the process of being fired or removed from

the department; that in killing Garcia he had acted with disregard of the safety of others and in

violation of police standards and rules; and that he had fired his weapon improperly and without

good reason in violation of police policies." *Id.*, at 1084.  The district court concluded that the

officer qualified as a public official under *Gertz* and granted summary judgment absent a

showing of malice, which the Utah Supreme Court affirmed.  *Id.*  In determining the officer's

status as a public figure, the Court noted:

> [I]t is not necessary that one be a public figure for all purposes and at all times.
> The law recognizes public figures for limited purposes who are sometimes
> referred to as "vortex public figures" because although they are not pervasive
> public figures, such as actors and other prominent persons, they have voluntarily
> or involuntarily been injected into a specific controversy of public interest.

*Id.*  The Court then ruled that the officer was or became a public figure by virtue of the facts and

circumstances surrounding the shooting.  *Id.*, at 1085.

The plaintiffs qualify as public figures.  They were injected into a labor dispute, largely

due to their own actions, that greatly affected and interested the public.  They had ample access

to media outlets and they used those outlets to express their opinions on numerous occasions.

41

For these reasons, the plaintiffs qualify as public figures. Because the plaintiffs qualify as public figures, the newspapers are entitled to protection from claims of defamation under the neutral reportage privilege so long as their statements did not deliberately distort the truth to attack the plaintiffs.

The present facts parallel those in *Edwards*. *Edwards* involved a defamation suit based on an article in which the New York Times accurately reported "dramatic statements of the National Audubon Society attacking the good faith of prominent scientists supporting continued use of the insecticide DDT." *Edwards v. National Audubon Soc'y*, 556 F.2d at 115 (2d Cir. 1977). When the New York Times received the names of the scientists the Audubon Society accused of being "paid liars", it "attempted to secure comments from each of the five accused." *Id.*, at 117. Three scientists responded, each categorically denying the charges. *Id.* "Having thus in good faith elicited both sides of the story to the best of his ability, [the reporter] wrote the article." *Id.*, at 118.

The allegations against the Salt Lake Tribune and the Deseret Morning News arise from articles chronicling a lengthy labor dispute. Almost invariably, the authors sought each party's position. On some occasions, the plaintiffs refused to comment, which the Salt Lake Tribune and Deseret Morning News duly noted. On other occasions, the plaintiffs commented extensively on their position, which both the Salt Lake Tribune and Deseret Morning News reported. The articles clearly reveal that the reporters went to extensive lengths to interview and cull information from the miners, CWM, IAUWU and other parties close to the dispute. Comments and opinions were routinely attributed to the party that offered them. Nothing in the articles suggests that the reporters or their employers, the Salt Lake Tribune and Deseret Morning News, deliberately distorted any information to attack the plaintiffs. Plaintiffs' naked

42

allegation that "Defendants' statements as described above were made with malice" is insufficient to overcome this privilege. *See* Second Amended Complaint, ¶ 188. This allegation is vague and completely discredited by the content of the articles. Absent an allegation that the journalist or publisher acted with malice that is not clearly discredited by the very publication alleged, as is the case here, the Salt Lake Tribune and Deseret Morning News are protected by the neutral reportage privilege.

## II.    The Militant

Plaintiffs next allege, "The Militant and its agents made the following publications, not as reports or statements by others, but as their own personal representations." *See* Second Amended Complaint, ¶ 124. This initial allegation places The Militant on a different footing than its counterparts the Salt Lake Tribune and Deseret Morning News. It states that The Militant engaged in a personal, not neutral, publishing campaign. Plaintiffs did not include such an allegation against either the Salt Lake Tribune or Deseret Morning News.

The plaintiffs have also alleged that The Militant's publishing campaign against it was extensive and unrelenting. While the plaintiffs have picked sentences from a limited number of articles published by the Salt Lake Tribune and Deseret Morning News, they have alleged repeated defamations by The Militant in 75 articles beginning on October 6, 2003 and continuing through April 4, 2005. These allegations, plaintiffs maintain, represent a pattern from which a reasonable person could infer an intent to undermine the plaintiffs reputation.

Extensive reporting, however, is not sufficient to state a claim for defamation. The content must meet the requirements under the law. The Court finds that the content of The Militant's articles concerning the labor dispute could convey defamatory meaning. Where the Salt Lake Tribune and Deseret Morning News attempted to display the perspectives of both the

miners and the owners, it is arguable The Militant offered no such neutral forum. For instance, plaintiffs allege:

> The Militant Editor Argiris Malapanis published these statements: The conditions at the Co-op were responsible for three deaths in the last half of the 1990s - half of the total coal mine deaths in the state.... The mine owners ... are notorious ... for their brutality against workers ... They are widely despised by working people for their abuse of women. For example, one of the directors of the Co-Op mine, John Kingston, was convicted for savagely beating his daughter.

*See* Second Amended Complaint, ¶ 135. The complete statements were published in the article as follows:

> The conditions at Co-Op were responsible for three deaths in the last half of the 1990s - half of the total coal mine deaths in the state. A UMWA statement notes that in September, as miners were taking steps to organize a union, they were fired en masse after they protested the arbitrary dismissal of one of their co-workers.
> The mine owners, the Kingstons, are a capitalist family notorious in the region for their brutality against workers they employ in their $150 million business empire. They are widely despised by working people for their abuse of women.

The Militant, Editorial, *Solidarity with Utah Miners!*, December 1, 2003.

Unlike the articles published in the Salt Lake Tribune and Deseret Morning News, added context strengthens, rather than weakens, the claim of defamation. In this article, The Militant states (1) that the plaintiffs were responsible for half of the mine-related deaths in Utah in the 1990s, and (2) that they abuse women. A reasonable reader could infer an intent to injure the plaintiffs' reputation from each of these statements, which is sufficient to constitute malice under *Linn* and overcome a motion to dismiss. Moreover, the article does not offer the plaintiffs the opportunity to rebut these allegations. For these reasons, the Court finds that the alleged defamations published by The Militant are capable of conveying defamatory meaning.

Unlike the publications of Salt Lake Tribune and Deseret Morning News, the statements published by The Militant do not meet the requirements for protection under the neutral

44

reportage privilege. The Militant published reports concerning the labor dispute that a reasonable reader could conclude distorted the image of the plaintiffs. Moreover, The Militant did not seek out comments from the plaintiffs or appear to offer them the chance to rebut the published accusations. For these reasons, the neutral reportage privilege does not shield The Militant from claims for defamation.

### III. The Individual Miners

Plaintiffs' fail to plead facts from which a reasonable person could infer malice on the part of Ricardo Chavez, William Estrada, Hector Flores, Daniel Hernandez, Guillermo Hernandez, Alyson Kennedy, Berthilda Leon, Samuel Villa Miranda, Domingo Olivas, Celso Panduro, Rodrigo Rodriguez, Gonzalo Salazar, Jesus Salazar, Jose Juan Salazar and Ana Marie Sanchez (collectively "Defendant Miners"). Plaintiffs cite a litany of statements made by Defendant Miners during the course of the labor dispute. Although these statements express the Defendant Miners' opinion that they were being treated unfairly, this does not rise to malice as required under the law. Laborers are entitled to their opinions. They are entitled to express those opinions, whether in the midst of a labor dispute or not. Plaintiffs' allegations seem to suggest that any opinion counter to their own is defamatory. Clearly, this is not the law. Plaintiffs' allegations against the Defendant Miners seem to be nothing more than an attempt to intimidate their employees and quell honest discussion concerning labor issues. Their claims of defamation against the individual miners are specious and disingenuous. Because plaintiffs fail to allege malice in the Defendant Miners' comments, they have failed to state a claim for defamation and those claims must be dismissed.

### IV. The UMWA and Jobs With Justice

45

The plaintiffs have alleged facts concerning the UMWA and Jobs With Justice from which a reasonable person could infer malice. Specifically, the plaintiffs have alleged that the UMWA or its agents stated:

> "These miners work for one of the most brutal companies around ... We need to stop this ruthless treatment of our miners."; "Dalpiaz called CWM "one of the most brutal employers in the country"."; "These workers are exploited" and what CWM was doing to the workers "went out with slavery."; and "They take advantage of these workers and just thumb their noses at any kind of law."

*See* Second Amended Complaint, ¶¶ 118, 119, and 122. These statements attack the plaintiffs' reputation by comparing the plaintiffs' practices to those utilized by slave-owners and labeling the plaintiffs as lawbreakers. Although dialogue in labor disputes is afforded great latitude, these statements may undermine the plaintiffs' reputation. The intent to undermine is heightened by the apparent lack of opportunity given to the plaintiffs to rebut these assertions. For these reasons, a reasonable person could infer that the UMWA intended to injure the plaintiffs reputation; therefore, the alleged defamations are capable of conveying defamatory meaning.

Plaintiffs allege Jobs With Justice has published similar statements. For instance, plaintiffs allege Jobs With Justice stated:

> Since [1979], this so-called union [IAUWU] has been owned, operated, and controlled by the powerful Kingston family. The union holds no meetings and its officers are not elected - they are appointed by and are members of the Kingston clan ... A mountain of evidence indicating that the Co-Op miners want representation with the UMWA and that the company union is a farce...

*See* Second Amended Complaint, ¶ 176. Like the statements published by the UMWA, these assertions impugn the plaintiffs' reputation and they offer no opportunity for rebuttal. For these reasons, the Court finds that they are capable of conveying defamatory meaning and malice, and therefore can sustain a claim for defamation.

## V. Conclusion on Defamation Claims

46

Based on the reasoning above, the motions to dismiss the defamation claims against the Salt Lake Tribune, Deseret Morning News, and the individual Defendant Miners are GRANTED and the motions to dismiss the defamation claims against The Militant, the UMWA, and Jobs With Justices are DENIED.

The Court would have reached this same result had the defendants moved for summary judgment rather than dismissal. During oral argument, the parties discussed whether the defendants' motions would have been more properly postured as motions for summary judgment because the Court might be required to engage in some fact-finding. Rule 12(b) states that if matters outside the pleadings are presented to and not excluded by the court, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." *See* Fed.R.Civ.P. 12. The plaintiffs' Second Amended Complaint includes the articles and statements alleged to have been defamatory. The Court has not looked outside these articles in reaching its determinations; moreover, it is not inclined to extend discovery beyond the articles for purposes of summary judgment because the crux of defamation is whether the publication could carry defamatory meaning. Extending discovery would not illuminate this determination.

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). With respect to the present defamation claims, there are no genuine issues of fact. No defendant disputes that the alleged defamatory statements were published. The publications clearly named the plaintiffs and the plaintiffs have cited the portions of the articles that they allege to be defamatory. The crucial remaining questions are whether the statements were capable of conveying defamatory meaning and whether they are protected by privilege, and each is a question of law to be resolved by the Court. As a matter of law, the articles published by the Salt Lake Tribune and Deseret

Morning News and the statements of the Defendant Miners are not capable of conveying

defamatory meaning and the newspapers' statements are further protected by the neutral

reportage privilege.

Where the statements are capable of conveying defamatory meaning and are not protected

by any privilege, as is the case with the other defendants, limited discovery may be necessary to

determine whether the statements are true and whether they actually injured the plaintiffs. The

remaining defendants may bring motions for summary judgment in the future based on these two

elements; however, the Court will limit discovery to evidence establishing the truth of the

statements and the damage they caused.

### B.     <u>Declaratory Relief</u>

In conjunction with their defamation claims, the plaintiffs seek a declaratory judgment to

the effect that seven of the individual defendants proffered inaccurate documentation when they

secured employment and that several defendants combined to constitute an enterprise under the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961(4).

With regard to immigration fraud, the United States government retains the exclusive

right to enforce immigration statutes. *See Chavez v. Freshpict Foods, Inc.*, 456 F.2d 890 (10th

Cir. 1972). In *Chavez*, "sixteen domestic workers from Colorado and Texas filed suit on behalf

of themselves and others....They allege that the appellees, 34 employers of agricultural workers,

employ Mexican nationals who have illegally entered the United States." *Id.*, at 891-892. The

Trial Court "held that no private action for enforcement of the immigration laws was intended,

either expressly or by implication." *Id.* The Tenth Circuit affirmed the Trial Court's ruling.

Private parties, such as the plaintiffs, have no standing to raise such immigration issues.

48

Under RICO, a claim can proceed only where an injury attributed to RICO violations is alleged. *See Grider v. Texas Oil and Gas Corp.*, 868 F.2d 1147, 1149 (10th Cir. 1989). The *Grider* Court held, "It thus appears from the plain language of these two provisions that a plaintiff seeking civil damages for a violation of section 1962(a) must plead facts tending to show that he was injured by the use or investment of racketeering income." *Id.* Plaintiffs have pled no facts tending to show injury by the use of racketeering income.

Even if the plaintiffs had overcome these barriers, Fed R. Civ. P. 9(b) requires averments of fraud to be stated with particularity. Plaintiffs have failed to plead fraud with any particularity, in violation of Rule 9(b) and this Court's order. For these reasons, these claims are dismissed.

## C.   <u>Unfair Labor Practices</u>

Plaintiffs also claim certain defendants engaged in unfair labor practices. In *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245 (1959), the U.S. Supreme Court enunciated a rule of preemption that protects the exclusive jurisdiction of the NLRB over unfair labor practices. Specifically, the Court held that, "When an activity is arguably subject to §7 or §8 of the [National Labor Relations Act], the States as well as the federal courts must defer to the exclusive competence of the [NLRB] if the danger of state interference with national policy is to be averted." *Id.*

In the plaintiffs' second amended complaint, the plaintiffs allege violations of the labor agreement and unfair labor practices pursuant to 29 U.S.C. §158 and §159. *See* Second Amended Complaint ¶¶ 80-82. Both 29 U.S.C. §158 and §159 comprise part of §7 of the NLRB, and therefore are subject to the provisions of the NLRA under the Supreme Court's ruling in

49

*Garmon.* Because these claims are subject to the exclusive competence of the NLRB, these

claims are dismissed.

> **D.**     **Invasion of Privacy**

Plaintiffs also claim invasion of privacy. Invasion of privacy is a state law tort. Under

Utah law:

> The "false light" privacy tort provides that one is subject to liability to another for
> invasion of privacy if (1) he or she gives publicity to a matter concerning another
> that places the other before the public in a false light [; (2)] the false light in which
> the other was placed would be highly offensive to a reasonable person [;] and [(3)]
> the actor ha[d] knowledge of or acted in reckless disregard as to the falsity of the
> publicized matter and the false light in which the other would be placed.

*Stein v. Marriott Ownership Resorts, Inc.*, 944 P.2d 374, 380 (Utah Ct. App. 1997) (Citations

omitted).

Plaintiffs have failed to state a claim for false light/invasion of privacy. First, they have

failed to comply with the court's order that they plead their allegations with specificity.

Plaintiffs have pled:

> 201. Defendants gave publicity to matters concerning Plaintiffs that placed
> Plaintiffs before the public in a false light that would be highly offensive to a
> reasonable person. Defendants acted with knowledge of, or in reckless disregard
> as to, the falsity of the publicized matters and the false light in which Plaintiffs
> would be placed.
> 202. Aguilar, Chavez, Estrada, Flores, Gonzalez, Daniel and Guillermo
> Hernandez, Kennedy, Leon, Olivas, Panduro, Rodriguez, Gonzalo, Jesus, and
> Juan Salazar, Sanchez, Silva, Villa, UMWA and its officers and other agents, The
> Militant and its editors and reporters, PACE, Neckel, Utah Coalition of Jobs with
> Justice, Jobs with Justice, and one or more of the Doe Defendants, and each of
> them, conspired, planned, directed, instigated, advised, aided, abetted,
> encouraged, supported, participated in, mutually agreed to, and/or ratified the acts
> of one another as described herein, and are liable as though they had performed
> the acts themselves.

*See* Second Amended Complaint, ¶¶ 201-202. These allegations are utterly vague. They give the named defendants no indication of what acts allegedly placed the plaintiffs in a false light; only that they were "publicized matters."

Even if the allegations were sufficiently specific, the facts pleaded have not stated a claim. Labor disputes are highly publicized by nature. The U.S. Supreme Court in *Linn* stated that labor disputes are "[a]re frequently characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions. Both labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language." *See Linn v. United Plant Guard Workers of America, Local 114*, 383 U.S. at 58 (citations omitted). The plaintiffs cannot use false light as a tool to punish its opponents for the publicity that naturally arises from any labor dispute. Plaintiffs have failed to plead facts from which a reasonable person could conclude that the defendants "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed;" therefore these claims are dismissed.

### E.   Intentional Interference with Economic Relations

Plaintiffs also claim intentional interference with economic relations. In Utah, "A claim for intentional interference with economic relations "protects both existing contractual relationships and prospective relationships of economic advantage not yet reduced to a formal contract"." *Anderson Develop. Co., L.C. v. Tobias*, 116 P.3d 323, 331(Utah 2005) (citations omitted). "To succeed on such a claim, a plaintiff must demonstrate that "(1) ... the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an

51

improper purpose or by improper means, (3) causing injury to the plaintiff"." *Id.* The Court then

elaborated:

> With respect to the second element, only one alternative, either improper purpose
> or improper means, need be established; a plaintiff need not prove both.
> (Citations omitted).  To establish the first alternative, improper purpose, it is not
> enough to show that the defendant was motivated by ill will toward the plaintiff.
> (Citations omitted).  Rather, the plaintiff must show that the defendant's
> "predominant purpose was to injure the plaintiff."  (Citations omitted).  To
> establish the second alternative, improper means, a plaintiff must show "that the
> defendant's means of interference were contrary to statutory, regulatory, or
> common law or violated an established standard of a trade or profession.

*Id.*

Contrary to the requirements of the law, plaintiffs have alleged only that certain

defendants have "intentionally interfered with CWM's present and prospective economic

relations ... by improper means or for a predominantly improper purpose."  *See* Second Amended

Complaint, ¶¶ 208-210.  Although this allegation tracks the language of the law, it fails to plead

any facts that would suggest how the defendants committed this infraction.

Even if the plaintiffs had been sufficiently specific, nothing in the underlying facts of the

case suggests that a claim for intentional interference with economic relations could be stated.

Nothing in the background of the labor dispute suggests that the defendants' interference was

performed for an improper purpose or by improper means.  The miners' predominant purpose in

the labor dispute, as stated in their statements published by the Salt Lake Tribune and the Deseret

Morning News, was to improve their wages and working conditions.  The other defendants'

primary purpose seems to have been to rally support for the miners.  The Complaint itself

highlights this.  There is no indication of improper purpose in any of the defendants' actions.

Moreover, there is nothing to suggest that the labor dispute arose due to improper means.  In fact,

the NLRB settlement tacitly acknowledges that the means used in the dispute were proper. For these reasons, the claim of intentional interference with economic relations is dismissed.

### F.   Negligence

Plaintiffs attempt to recast their unfair labor practice and intentional interference with economic relations claims as negligence by stating "Defendants owed Plaintiffs a duty of care to refrain from interfering with CWM's contractual relations with its employees." *See* Second Amended Complaint, ¶ 215. "To establish negligence or gross negligence, a plaintiff must first establish a duty of care owed by the defendant to the plaintiff." *Ferree v. State of Utah*, 784 P.2d 149, 151 (Utah 1989) (Citations omitted). "Duty is a question of whether the defendant is under any obligation for the benefit of a particular plaintiff." *Id.* (Citations omitted).

There is nothing to suggest that any defendant was under any obligation for the benefit of the plaintiffs. Certainly no defendants except the Defendant Miners were linked with the plaintiffs in any way, and no reasonable person would suggest that disputing or reporting labor conditions that may rise to the level of human rights violations, including exploitation and abuse, would breach any duty. The claim is dismissed.

### G.   Civil Conspiracy

Plaintiffs' final claim is civil conspiracy. The crux of this claim clearly falls within plaintiffs' claims for unfair labor practices, over which the NLRB retains exclusive jurisdiction. For this reason, the claim is dismissed.

## **CONCLUSION**

The motions to dismiss are hereby GRANTED in part and DENIED in part as set forth in this Opinion and Order. Reasonable attorneys' fees are awarded to the Salt Lake Tribune and Deseret Morning News.

IT IS SO ORDERED.

DATED this $30^{\underline{th}}$ day of April, 2006.

Dee Benson
United States District Judge

54